# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

---

LEE M. BLEECKER,
SANFORD ENTERPRISES,
MILLER GRAIN DRYING
 & STORAGE, INC.,

          Plaintiffs,

        v.                                  Case No. 04-C-0552

VILLAGE OF DOUSMAN BOARD,
PLAN COMMISSION OF THE
 VILLAGE OF DOUSMAN,
BARTLEY ZILK,
MARK SCHROEDER,
CINDY QUEEN,
JOHN NISSEN,
CHRISTOPHER HETTICH,

          Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE

      Plaintiff, Lee Bleecker, owns and operates businesses in and around the Village of Dousman, Wisconsin. Bleecker's businesses include plaintiffs Sanford Enterprises and Miller Grain Drying & Storage, Inc. This action against the Village of Dousman Board (the Board), Plan Commission of the Village of Dousman (the Plan Commission), as well as several officers of the Board and Plan Commission, asserts federal and state claims arising out of several development proposals that the plaintiffs contend that the defendants refused to approve for improper reasons.

      This court has jurisdiction over Bleecker's federal claims pursuant to 28 U.S.C. § 1331 and may exercise supplemental jurisdiction over his state law claims pursuant to 28

U.S.C. § 1367. The defendant's motion for summary judgment is ready for decision. For the reasons set forth below, the motion will be granted and this case will be dismissed.

SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chi.*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

2

## BACKGROUND

Lee Bleecker owns and operates a number of businesses in and near the Village of Dousman, Wisconsin, individually or through other entities and corporations of which he is the sole owner, principal, or agent. Among these are Sanford Enterprises and Miller Grain Drying & Storage, Inc.[1] (Compl. ¶¶ 6-7.) The defendants include the Village of Dousman Board, which is a Wisconsin municipal governing board, and the Plan Commission of the Village of Dousman, which is a Wisconsin municipal planning commission, created pursuant to Wis. Stat. § 61.35, and the Village of Dousman ordinances. (*Id.* ¶ 9.) Several individual members of the Village Board and Village Plan Commission are defendants: Bartley Zilk, President of the Board, Mark Schroeder, an officer of the Board and a member of the Plan Commission, as well as Cindy Queen, John Nissen, and Christopher Hettich, officers of the Board during the relevant time frame. (*Id.* ¶¶ 10-14.)

At issue in this case are land use proposals presented by Bleecker to the defendants for approval. In particular, the events at issue surround a 1998 proposal by Bleecker to construct a restaurant on property he owned at 159 Highway 67; a 2002 proposal to construct a car wash/oil change center near that same property; and a proposed division and development of property at 234 Evergreen Street.[2] All are discussed in turn below.

Bleecker owns a gas station/convenience store known as the "Paper Chase" at 159 Highway 67 which apparently serves as a primary traffic route into Dousman. Bleecker

---

[1] For ease of reference, the court will refer to Lee Bleecker as representative of all plaintiffs.

[2] The Complaint addressed matters relating to Miller Grain Drying & Storage, Inc. property, a proposed Subway shop on Bleecker's gas station property, and a clinic located on property at 370 Venture Drive in Dousman. The defendants addressed these issues in their Motion for Summary Judgment and supporting documents, and Bleecker refers to them in his proposed findings of fact in opposition to summary judgment. However, because Bleecker makes no use of these matters in support of his argument in opposition to the defendant's summary judgment motion, they are not further discussed.

3

applied for and received a conditional use permit (CUP) from the Village to construct the gas station and store in 1992, and in 1998 he applied for permission to add a restaurant to the same site. (Compl. ¶ 23; Bleecker 12/8/04 Dep. 13-14). The proposed change required approval by the Plan Commission and Board of a new conditional use.[3]

On May 21 and May 26, 1998, representatives of the Village along with Independent Inspectors, Ltd. (IIL), the Village's contracted building inspectors, met with Bleecker's representatives to discuss what was needed to complete the application for the expansion of the conditional use of the gas station/convenience store property. (Bleecker Aff. ¶ 5; P. Nelson Aff. Ex. P.) On July 23, 1998, the Board issued an order "Granting Conditional Use and Prescribing Conditions for Lee M. Bleecker. . . . to Expand an Existing Conditional Use and to Operate a Restaurant in the Village of Dousman." (Compl. Ex. A; P. Nissen Aff. Ex. B.) The new CUP placed a number of demands on the property. It provided in relevant part:

> 4. Site Plan Prior to Building Permits. Petitioner shall file with the Village Clerk a detailed site plan or amendments to the site plan currently on file, which shall be subject to the approval of the Village President, Village Planner and Village Engineer prior to the issuance of any building permits, and which, at a minium, shall describe in detail the following issues:
> . . .
>> f. Location and type of septic and water facilities, along with written proof that the same have been approved by the Waukesha County Health Department;
>> . . .

---

[3] The parties do not dispute that the Board and Plan Commission are permitted to approve conditional use permits and that they may impose reasonable restrictions on development pursuant to state law and local ordinance. A conditional use approval allows a person "to put his property to a use which the ordinance expressly permits' when certain conditions have been met." *State ex rel. Skelly Oil Co. v. Common Council, City of Delafield,* 58 Wis. 2d 695, 701, 207 N.W.2d 585, 587 (1973).

4

h. Landscaping plan, including but not limited to location, type, and size of all screening and landscaping on the subject property, along with such other information as the Plan Commission or Village Board may request. The landscaping plan shall include a schedule for completion of all landscaping work, and if none is indicated the landscaping work shall be completed prior to the occupancy or operation of the restaurant and/or addition on the property.

5. Site Plan Prior to Occupancy Permit. Petitioner shall file with the Village Clerk a detailed site plan or amendments to the site plan on file which shall be subject to approval of the Plan Commission and Village Board prior to the issuance of any occupancy permits, and which, at a minimum, shall describe in detail the following issues:
a. Location and capacity of the parking facilities showing a minimum of thirty (30) legal parking spaces;
. . .
d. Location and nature of garbage and refuse disposal facilities. . . .

(Compl. Ex. A.) On July 24, 1998, the Village clerk issued a letter to Bleecker's attorney advising that Bleecker would need to comply with Dousman Ord. §17.29, requiring the landscaping to be installed within 365 days of occupancy. (P. Nissen Aff. Ex. C.) A restaurant now exists on the property; Bleecker leases the space for the restaurant, the Sunny Side Up Café, to an independent owner and operator. (Compl. ¶ 22.)

Moving ahead to March 21, 2002, Bleecker submitted a plan for a proposed car wash and oil change facility near the gas station property. (P. Nissen Aff. Exs. I, K; Bleecker Aff. ¶ 20.)[4] The site plan was reviewed by IIL, and on March 27, 2002, IIL issued a letter to

_____

[4] The documents submitted by the parties conflict as to where the car wash/oil change center was to be located. Bleecker's affidavit declares that the site was "169 Highway 67." (Bleecker Aff. ¶ 20.) However, the letter issued by IIL to Bleecker indicates that the site was "157 Highway 67." (P. Nissen Aff. Ex. K.) In any event, it appears the proposed site was not directly on the existing gas station property (159 Highway 67).

5

Bleecker identifying "several issues that need to be addressed." (P. Nissen Aff. Ex. K.) These included issues with the drainage plan, discrepancies between the site plan and existing plan on file, a proposed road access easement for which there was no record of approval, the need for Wisconsin Department of Transportation approval for an entrance driveway, need for approval of the proposed parking plan, and the need for approval of materials for the building facade. *Id.* At the Village's request, an engineering firm, Ruekert Mielke, reviewed the site plan information, and in letters dated March 28, 2002, and April 11, 2002, advised the Board of similar issues concerning the proposal. (P. Nissen Aff. Exs. J, L.)

Bleecker was advised by IIL that the specified corrections were necessary before the proposal would be forwarded to the Plan Commission for consideration and approval. (P. Nissen Aff. Ex. K; Pls.' Resp. to Defs.' PFOF 35.) However, he disagreed that the issues noted needed to be remedied, but resubmitted a proposal to address some of the issues on May 5, 2002. (Bleecker 12/8/04 Dep. 57-59.) In a letter dated May 31, 2002, IIL raised additional concerns regarding Bleecker's latest submission and again informed Bleecker that the items mentioned would have to be addressed before the project would be presented to the Plan Commission. (Scodellaro Aff. Ex. O). However, Bleecker declined to submit a new proposal for the car wash/oil change center because he "was done fighting. . . ." (Bleecker 12/8/04 Dep. 57.)

The next year, on August 4, 2003, Bleecker submitted plans to change signs on the gas station property—he sought to change the property sign from Amoco to BP (British Petroleum). (P. Nissen Aff. Ex. D; Bleecker Aff. ¶ 7.) Later that month, IIL issued a letter to Bleecker regarding review of the proposal and the CUP in place:

A review of the above referenced application has been initiated. The review of the Conditional Use issued in 1998 has a condition that the Conditional Use had an initial one-year term, which expired in 1999. There were no records found of any renewals requested or granted.

Also, the pole sign requested exceeds the maximum square feet allowed by the Village of Dousman Zoning Code. . . .

Furthermore, the following items are not in compliance with the Conditional Use and Site Plan approval:

•    30 Parking stalls not striped per approved plan
•    Dumpster enclosure not constructed
•    Landscaping not installed per approved plan or per Section 17.29 of the Village of Dousman Zoning Code
•    Some signage on the property has not received approval per the Conditional use.

This is not a complete list of all outstanding items.

The Conditional Use renewal needs to be requested and all outstanding issues with this property need to be addressed to allow your Conditional Use and Site Plan amendment application to proceed.

(P. Nissen Aff. Ex. E.)  In addition, Bleecker had not connected the gas station/restaurant property to the Dousman municipal water system.  (J. Nissen Aff. ¶ 7; M. Schroeder Aff. ¶ 7; C. Hettich Aff. ¶ 7; B. Zilk Aff. ¶ 7; C. Queen Aff. ¶ 7.)

Subsequently, the Board refused to consider Bleecker's sign proposal due to noncompliance with the recorded site plan and CUP.  (J. Nissen Aff. ¶ 8; M. Schroeder Aff. ¶ 8; C. Hettich Aff. ¶ 8; B. Zilk Aff. ¶ 8; C. Queen Aff. ¶ 8; Bleecker Aff. ¶ 8-9).  Thereafter, Bleecker submitted a proposal to have the site approved as-built. (Compl. ¶ 45; J. Nissen Aff. ¶ 9; Bleecker Aff. ¶ 12.)  The Board rejected the as-built proposal, and, instead, proposed a modified "Landscaping Agreement" on January 20, 2004.  (Compl. ¶ 47; P. Nissen Aff. Ex. F; J. Nissen Aff. ¶ 9; Pls.' Resp. to Defs.' PFOF ¶ 24.)  In response, Bleecker submitted his own

7

amended "Landscaping Agreement," which was rejected by the Board. (P. Nissen Aff. Exs. G, H; Bleecker Aff. ¶ 17.) Apparently, no resolution was reached.

Another dispute with the defendants arose concerning land Bleecker owned at 234 Evergreen Street. He purchased this property nearly twenty years ago when it was a vacant lot and he sought to place an existing ranch house on the land. (Bleecker 12/8/04 Dep. 160.) Bleecker then sold the vacant property to Randy Schade and Schade applied for a CUP to move a house (owned by Bleecker) onto the property in 2001. However, after the house was moved, Schade failed to come up with the money to purchase the house. Bleecker, as owner, permitted Schade to rent the house. (Bleecker 12/8/04 Dep. 162-65.) Later, Schade defaulted on a land contract and Bleecker foreclosed on the property. In 2003, Bleecker sought to divide the Evergreen Street property into two lots so that he could move another house onto the newly created lot. To this end, Bleecker applied for a CUP. However, the CUP approved by the Board differed from that approved for Schade in several respects, such as the amount of fill required as well as the hours and filling methods. (Bleecker 12/8/04 Dep. 170.) Bleecker viewed the differences between the two CUPs as evidence that the defendants imposed unfair burdens on his proposals compared to others.

Bleecker filed the instant action Denial of Equal Protection in Violation of 42 U.S.C. § 1983 and Article I, Section I of the Wisconsin Constitution (Count I); Denial of Due Process in Violation of 42 U.S.C. § 1983 and Article I, Section I of the Wisconsin Constitution (Count II); Conspiracy to Deny Civil Rights in Violation of 42 U.S.C. § 1985 (Count III); Malicious, Wilful, and Intentional Acts (Count IV); Estoppel (Count V); Civil Conspiracy under Wisconsin common law (Count VI); and Conspiracy in Violation of Wis. Stats. § 134.01 (Count

VII).  Since this case started, defendants Independent Inspectors, Ltd., Robert Blankenheim, and Thomas DeLacy have been dismissed.  (Stip. for Dismissal, Doc # 40.)

DISCUSSION

Bleecker brings seven claims which the defendants have addressed in turn. However, in responding to the defendant's motion for summary judgment, Bleecker has chosen only to defend his federal equal protection claim (Count I), federal substantive due process claim (Count II); federal conspiracy claim (Count III); common law conspiracy claim (Count VI); and his Wis. Stat. § 134.01 Injury to Business claim (Count VII).  Hence, as the defendants' motion is undisputed as to claims under the Wisconsin Constitution as well as Counts IV and V of the Complaint, and it appears from the defendants submissions that there are no material issues of fact which would preclude summary judgment as to those claims. *See* Fed. R. Civ. P. 56(e)(2); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir.1999) (noting that arguments not presented in response to a summary judgment motion are waived).

I.  Equal Protection

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that he or she was (1) deprived of a federal right, privilege, or immunity (2) by any person acting under color of state law.  *Gomez v. Toledo*, 446 U.S. 635, 638 (1980).  Here, Bleecker asserts that the defendants violated his equal protection rights under the U.S. Constitution.

The equal protection clause of the Fourteenth Amendment commands that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."  *U.S. Const. amend. XIV § 1.* The Clause directs that all persons similarly situated should be treated alike.  *See* U.S. Const. amend. XIV; *City of*

9

*Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  The equal protection guarantee concerns classifications.  *See Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 712 (7th Cir.2002).

> The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action.  A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences.  It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Nabozny v. Podlesny*, 92 F.3d 446, 453-54 (7th Cir.1996) (*quoting Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir.1982)).  Thus, to establish liability under the Equal Protection Clause, a plaintiff must show that a defendant "acted with a nefarious discriminatory purpose" and discriminated against him based on his membership in a definable class. *Id.* at 453.

Even so, a plaintiff may constitute a "class of one."  *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir.2001).  "[W]hen a 'powerful public official pick[s] on a person out of sheer vindictiveness,'" the equal protection clause may be violated.  *Id.* (*quoting Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir.1995)).  To establish class-of-one discrimination, a plaintiff must show two elements: that he "has been intentionally treated differently from others similarly situated *and* that there is no rational basis for the difference in treatment."  *Martin*, 295 F.3d at 712 (internal quotation marks omitted) (emphasis added); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir.2000) ("[T]o make out a prima facie case the [plaintiffs] must present evidence that the defendant deliberately sought to deprive [them] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position.").

10

To establish the first prong—difference from others similarly situated—the plaintiff must show that comparators are "'prima facie identical in all relevant respects,'" or "'directly comparable to plaintiff in all material respects.'" *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005) (internal citations omitted).

In *Purze v. Village of Winthrop Harbor*, the Seventh Circuit concluded that the defendants:

> the allegedly similarly-situated individuals in this case requested different variances than the Purzes requested; submitted their plats during different time periods; and had their plat requests granted by different and previous Boards. . . . The Purzes . . . cannot establish their prima facie case by referring to a development with variances from the Subdivision Code of a kind not requested by the Purzes and with variances that were requested under circumstances very different from the Purzes' present situation.

286 F.3d 452, 455 (7th Cir. 2002). The court distinguished *Purze* from *Ciechon v. City of Chicago*, 686 F.2d 511, 522-24 (7th Cir.1982), in which two paramedics were considered "similarly situated" as both had "experienced the same set of circumstances, and were equally responsible for the assessment, treatment, and the welfare of the patient, yet only one paramedic was disciplined after the death of a specific patient." *Id.*; *see also Bell v. Duperrault*, 367 F.3d 703. 708-09 (7th Cir. 2003) (finding that persons were not similarly situated where they submitted applications for pier extensions at different times, requested different extensions, or requested to replace existing structures rather than build new ones.)

Here, Bleecker compares and contrasts his situation with that of Dousman resident Larry Williams, Sr. Williams, the father of defendant Queen, owns and operates the Bullfrog Station gas station/convenience store in downtown Dousman. In 1998, Williams applied for a CUP to add a car wash to the Bullfrog Station property. (Bleecker Aff. Ex. M.) The proposal was reviewed by the Village's engineer, who noted several items that needed to

11

be addressed before approval could be recommended.  (*Id.* Ex. N.)  These items included a

traffic plan, a parking plan, drainage and storm water plans, as well as landscaping.  (*Id.*)  IIL

also conducted a review of the conditional use proposal and issued a report in September

1998.  (*Id.* Ex. O.)  In a letter dated October 14,1998, the engineer indicated to the Village clerk

that a majority of the items listed on its previous report regarding Williams' proposed car wash

had been completed but a few others were incomplete.  (*Id.* Ex. P.)  On October 24, 1998, the

Village Board issued an order granting Williams conditional use authorizing operation of a car

wash on the Bullfrog Station property.    However, the approval was subject to multiple

conditions similar to those required of Bleecker in the 1998 CUP for his restaurant expansion.

(*Id.* Ex. Q.)

        In addition, Williams, like Bleecker, later applied to the Plan Commission to

change his gas station signs from Amoco to BP.  (Scodellaro Aff. Ex. H.)  The same pole

would be used for the sign.  The change was deemed a minor amendment to the site plan,

which did not require a change in conditional use.  *Id.*

        According to Bleecker, the car wash/oil change center he proposed was

"disfavored by the Village Board and Plan Commission from the beginning."  The Plan

Commission and the Board insisted on compliance with what Village inspectors considered

deficiencies.  But, according to Bleecker, compliance was "impossible . . . because . . . certain

defendants did not like Mr. Bleecker." (Pls.' Br. in Opp. 16.)  Further, Bleecker maintains that

he "made the same application" to change gas station signs from Amoco to BP; however,

unlike with Williams, his application was treated as a change to the CUP.

        Notwithstanding these contentions, Bleecker failed to establish that his

comparator is identical in relevant respects.  First, with regard to Williams' car wash, the

proposals differed in location, placement, and purpose. Bleecker's proposal is for a car wash/oil change center on the outskirts of Dousman and on property located *near* his gas station/convenience store. On the other hand, Williams' proposal was for a car wash—sans oil change center—in downtown Dousman on the *same* property as his gas station/convenience store. Also, the proposals were made more than three years apart. These discrepancies bring this matter in line with *Purze v. Village of Winthrop Harbor*, which instructs that in such instances, an approving agencies' different treatment of applicants is insufficient if the comparators presented distinct claims to the agency. As the Purzes "requested different variances" than the alleged comparators, Bleecker and Williams presented different projects in different locations with different concerns to the Plan Commission and Board.

Further, with regard to the change in gas station signs, the record indicates that Bleecker's new sign proposal was simply not considered because he was not in compliance with the list of outstanding conditional use issues noted repeatedly by the Plan Commission. On September 3, 2003, the Plan Commission noted that the proposed sign exceeded the size permitted by ordinance, and that placement of such a sign would require a variance approved by the Board. The Plan Commission observed on November 5, 2003, that "[s]ince Bleecker has not completed that [list of conditional use issues previously noted], the Plan Commission cannot approve anything happening on the property when conditional use is not valid." (Bleecker Aff. Ex. I.) Nevertheless, the Commission permitted the oil distributor to immediately change the face of Bleecker's existing signs to reflect BP's purchase of Amoco. (*Id.*)

Bleecker points to his application for a "minor land division and to move a house onto a newly created lot at 236 Evergreen Street." (Pls.' Br. in Opp. 17.) He asserts that he

13

was treated differently than his "neighbor," Randy Schade, when Schade made an earlier proposal to move a house onto that lot. However, the record reveals that this comparison is insufficient to demonstrate "similarly situated" comparators. As mentioned earlier, Bleecker first owned the vacant land at 234-236 Evergreen Street. He then sold the lot to Schade, and Schade applied for a CUP so that a house could be moved onto the property. This was approved and completed. Bleecker regained the property and sought Village approval to divide it into two lots and to put a house next door to the first. According to Bleecker, the Village included in his conditional use burdensome matters, specifically the amount of fill needed for the property beyond that required of Schade, suggesting he was treated disfavorably to a comparator.

Bleecker's efforts fail to establish that he and Randy Schade are comparators in all material respects in as much as Schade filed an application for placement of a home on a vacant lot and he filed an application for division of an improved lot and placement of a house on the subdivided lot. Further, the minutes of the August 8, 2003, Board meeting indicate only that the Village was going to require Bleecker to construct a new home on the new lot, as opposed to move an existing home. (Scodellaro Aff. Ex. M.)

With regard to the second prong of the equal protection analysis—lack of rational basis—the Seventh Circuit recognized disagreement among circuit decisions on the matter:

> The exact contours of the second prong of the class of one equal protection claim are not quite clear. As we noted above, the Supreme Court in *Olech* held that it has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated *and that there is no rational basis for the difference in treatment*." 528 U.S. at 564, 120 S.Ct. 1073 (emphasis added). However, since *Olech* was decided, the standard for such class of one claims has been muddled in this

circuit by two divergent lines of cases. In one line of cases, panels of this court have held that a class of one equal protection claim is established where the defendant has intentionally treated the plaintiff differently than others similarly situated either without any rational basis for doing so or out of some "totally illegitimate animus." In another line, however, we have held that the mere absence of a rational basis is not enough to sustain the class of one claim, and that instead the plaintiff must prove illegitimate animus in order to succeed.

*Racine Charter One, Inc.,* 424 F.3d at 683-84 (internal citations omitted). However, the court refused to endorse one or the other, instead finding that the plaintiff failed under either standard. Therefore, both lines are addressed below.

As to "rational basis" test, the court "will uphold the legislative enactment (or classification) so long as it bears a rational relation to some legitimate end." *Eby-Brown Co., LLC v. Wis. Dep't of Agric., Trade & Consumer Protection*, 295 F.3d 749, 754 (7th Cir. 2002).

A court will not strike down a state policy merely because it may be unwise, improvident, or out of harmony with a particular school of thought. Rather, this inquiry requires the court to consider only whether any state of facts reasonably may be conceived to justify the classification, and it is enough that a purpose may conceivably or may reasonably have been the purpose and policy of the relevant governmental decisionmaker, even if the decisionmaker never articulated that rationale.

*Racine Charter One, Inc.*, 424 F.3d at 685 (internal quotations and citations omitted). As such, Bleecker must show that the policies imposed by the defendants upon him had no rational relation to any legitimate government purpose.

As to "totally illegitimate animus" test, the Seventh Circuit has noted that

to make out a prima facie case the plaintiff must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position. We described the class of equal protection cases illustrated by *Olech* as "vindictive action" cases and said that they require proof that the cause of the

> differential treatment of which the plaintiff complains was a totally illegitimate animus toward the plaintiff by the defendant.

*Hilton*, 209 F.3d at 1008. For example, in *Hilton*, the court noted that "[i]f a merely unexplained difference in police treatment of similar complaints made by different people established a prima facie case of denial of equal protection of the laws, the federal courts would be drawn deep into the local enforcement of petty state and local laws." *Id.*

Targeting both rational basis as well as animus, Bleecker asserts that the "most significant" example of vindictive action by the defendants against him is "the separate treatment policy which the Village President ordered to be drafted and which applied only to Bleecker." (Pls.' Br. in Opp. 18.) According to Bleecker, "there was no reason for this separate policy other than the Village wanted to make it as difficult as possible for . . . [him] to obtain approvals for his projects." *Id.* For support, he points to a February 18, 2002, letter addressed to his counsel from IIL's Robert Blankenheim. The letter reads in part:

> In response to your letter of February 11, 2002, we have developed a policy designed to protect everyone (your client, employees of Independent Inspections and the Village of Dousman) when dealings arise involving Lee Bleecker.
>
> In response to your letter of February 11, we will accept only written authorization, from you, to enter your client's properties. This process will provide all parties involved with a paper trail of any inspections conducted on your client's properties. In addition there will be no personal, telephone or fax contact allowed between your client or his employees and any employee of Independent Inspections. All contact on behalf of Mr. Bleecker shall be in written form and submitted by you. This will include, but not limited to, permit application submittal, code clarification questions or inspection requests.
>
> Furthermore, in light of your warning to "physically remove" our employees from your client's property, we must act in a manner which will best protect our employees. Therefore, due to the proven threat of violence, your client, or his employees, will not be

16

> allowed on site while inspections are being performed.  We will
> only conduct these inspections with you, a representative of your
> office or a third party acceptable to Independent Inspections,
> present.   Independent Inspections may send one or more
> inspectors to each inspection, at our discretion.
> . . .
> We believe this policy will eliminate any conflicts or confrontations
> between your client, Mr. Bleecker, and Independent Inspections
> on behalf of the Village of Dousman.

(Bleecker Aff. Ex. R.)  Apparently, the letter was issued in response to a letter by Bleecker's counsel advising that IIL agents or employees will not be permitted on any of Bleecker's property without prior permission.  (DeLacy Dep. 305-07.)

Although defendant Zilk may have authorized IIL to draft the letter, (Id. at 53), Bleecker does not present evidence that a "policy" consistent with the letter was ever adopted or enforced by any of the defendants.[5]  Nonetheless, the defendants present evidence that no policy along these lines was ever in place.  (*See* DeLacy Dep. 308-09.)  Thus, there is no support for Bleecker's conclusion that the defendants pursued an irrational and unreasonable policy against him or that IIL's February 18, 2002, letter reflects the defendants' illegitimate animus toward him.   Even if such a policy were in place, it is not apparent from the record that implementation of such a policy—consisting of access restrictions and writing requirements—would constitute "governmental action wholly impossible to relate to legitimate governmental objectives."  *Forseth v. Village of Sussex*, 199 F.3d 363, 371 (7th Cir. 2000).

Next Bleecker asserts that the Village's "vindictive conduct" is demonstrated by the Board's threat to "close the Sunny Side Up, a restaurant-tenant to Mr. Bleecker's gas station/convenience store property, not for anything that the tenant did or did not do, but

---

[5] IIL and Blankenheim were previously dismissed as defendants in this action.

because Mr. Bleecker would not sign a landscaping agreement that included punitive provisions to which Mr. Bleecker would not agree." (Pls.' Br. in Opp. 19.) The incident involved a March 19, 2004, letter from the Village attorney to Eleasar Estrada, operator of the restaurant,[6] informing him that Bleecker's gas station property was not in compliance with the requirements of the site plan and CUP, and that occupancy may no longer be permitted. (Compl. Ex. H.)

The goal of the threat, according to Bleecker, was to "force that tenant to put pressure on Mr. Bleecker." (Pls.' Br. in Opp. 24.) However, this argument side-steps the point that the Village considered Bleecker's property noncompliant with his conditional use permit.

Bleecker's overarching assertion is that the totality of circumstances—the conditional use issues with gas station/convenience center, the proposed car wash/oil change center, the gas station sign, the conditional use issues with the lots at 234 and 236 Evergreen Street, the alleged "Bleecker policy," and the threat against the Sunny-Side Up Cafe—demonstrate the defendants' illegitimate animus and abuse of local government power. Further, Bleecker highlights what may be called "unprofessional" statements by several defendants. For example, defendants Queen and Zilk referred to Bleecker as an "ass" and "the biggest pain in the ass that the Village has." (Pls.' Br. in Opp. 17 n.4.) Nevertheless, the

---

[6] The letter is addressed to Eleasar Estrada, and identifies him as the operator of the Sunny Side Up Restaurant on property located at 159 Highway 67 in the Village of Dousman. (Compl. Ex H.) The defendants identify Mr. Estrada as Bleecker's tenant and operator of a restaurant at the LB Unlimited property. (Defs.' PFOF 28-29.) In response to this proposed finding of fact, Bleeker states "the Plaintiffs deny that Mr. Estrada is the current tenant of Mr. Bleecker and that he is operating a restaurant at the LB Unlimited property. Furthermore, the Village is aware of who the current tenant of that restaurant is because the Village has issued an occupancy permit and licences to that person." (Pls.' Resp. to Defs.' PFOF 29.) Plaintiffs then cite "Bleeker Aff. ¶ 19" which simply states "Mr. Eleasar Estrada is not the current tenant of the restaurant operating at LB Unlimited 159 Highway 67 property." This assertion is made despite Bleecker's deposition testimony identifying Estrada as the current tenant operating the restaurant. (Bleecker 10/13/05 Dep. 7.) Who the current tenant is irrelevant to the matters at hand. The court assumes that, based on the record, Mr. Estrada was the tenant at all times relevant to this case. However, this alleged "disputed fact" reflects the court's difficulty in navigating the proposed facts submitted by the parties.

18

court is unable to conclude that Bleecker was treated differently than similarly situated persons; that the defendants pursued irrational and unreasonable policies or that any differential treatment of Bleecker was the direct result of totally illegitimate animus.

## II. Due Process

Bleecker's second claim under 42 U.S.C. § 1983 is that the defendants violated his substantive due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution. In a § 1983 analysis, the substantive due process doctrine is quite limited. *Lee v. City of Chi.*, 330 F.3d 456, 467 (7th Cir. 2003); *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 965 (7th Cir.1998). "Accordingly, substantive due process is not 'a blanket protection against unjustifiable interferences with property.'" *Id.* (*quoting Schroeder v. City of Chi.*, 927 F.2d 957, 961 (7th Cir. 1991)).

"Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational." *Id.*; *see Washington v. Glucksberg*, 521 U.S. 702 (1997); *Polenz,* 883 F.2d at 558 ("What is apparent from these cases is that a plaintiff bears a very heavy burden in a substantive due process action attacking a decision of local zoning officials. And rightly so, for the federal courts are not zoning boards of appeal and will not overturn merely erroneous decisions. The plaintiff must overcome a presumption that the decision was reasonable and prove that the decision was irrational."). In other words, in order to prevail on a substantive due process claim, Bleecker "must allege and prove that the denial of [his] proposal is arbitrary and unreasonable bearing no substantial relationship to the public health, safety or welfare." *Estate of Himelstein v. City of Fort Wayne, Ind.*, 898 F.2d 573, 577 (7th Cir. 1990); *Burrell v. City of Kankakee*, 815

19

F.2d 1127, 1129 (7th Cir. 1987) ("[P]roperty is not denied without due process simply because a local planning board rejects a proposed development for erroneous reasons or makes demands which arguably exceed the authority under the relevant state's statute." (*quoting Creative Environments, Inc., v. Estabrook*, 680 F.2d 822 (1st Cir.1982)). "[A]n investigation into substantive due process involves an appraisal of the totality of the circumstances." *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998)

      Here, Bleecker argues that he "has a fundamental right to 'possess, use and dispose' of his property." For support, he cites *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). *Loretto* holds that a "permanent physical occupation authorized by government is a taking" under the Constitution for which just compensation is required. 458 U.S. at 441 ("Our holding today is very narrow. We affirm the traditional rule that a permanent physical occupation of property is a taking."). In considering the validity of a local government's decision to deny a plaintiff's proposed site plan, the Seventh Circuit in *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461 (7th Cir. 1988), discussed the relationship between a Taking Clause claim and a substantive due process claim. In that case, the plaintiffs alleged a substantive due process claim based on the local Board of Trustees' refusal to approve their proposed site plan for constructing office space on their property. In rejecting the claim, the court noted:

> But in cases under the [T]akings [C]lause the courts distinguish between taking away all of the owner's rights to a small part of his land and taking away (through regulation) a few of his rights to all of his land, and grant much broader protection in the first case. With *Loretto* compare *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 674 and n. 8, 96 S.Ct. 2358, 2362 and n. 8, 49 L.Ed. 2d 132 (1976); *Barbian v. Panagis*, 694 F.2d 476, 483-85 (7th Cir.1982), and cases cited there. The plaintiffs in this case have been deprived of their "right" to create 181,000 square feet

of office space on a 17-acre parcel of a much larger tract, and that deprivation is a limited, perhaps minimal, incursion into their property rights. If so it is not a deprivation at all, in the constitutional sense, and the due process clause is not in play.

*Id.* at 466. Hence, the court concluded that the plaintiffs had not been deprived of their property rights as to violate the Constitution. Going further, the court rejected that a substantive due process claim rested in the defendant-Board's failure to give reasons for rejecting the proposed site plan. It concluded that the case presented only "a garden-variety zoning dispute dressed up in the trappings of constitutional law." *Id.*

Bleecker makes no attempt to construe his situation as a Taking Clause violation; he instead asserts that "at every turn, zoning ordinances, electrical codes, plumbing codes, hearing notices, public meeting requirements, parking violations, . . . Mr. Bleecker was systematically excluded from a fair and impartial consideration." (Pls.' Br. in Opp. 24.) However, the court cannot conclude that Bleecker's property rights were constitutionally violated or that the defendants actions were irrational, arbitrary, and unrelated to any legitimate government interest, such as public health, safety, morals, or general welfare. *See Pro-Eco, Inc. v. Board of Comm'rs of Jay County, Ind.*, 57 F.3d 505, 514 (7th Cir. 1995).

First, while it is acknowledged that Bleecker has certain fundamental property rights, similar to *Coniston Corp.*, the court cannot find that the arguable deprivation of Bleecker's right to install a car wash/oil change center on his property, place a ranch house or BP/Amoco sign upon his property, or perform other activities constitute a substantive due process violation. 844 F.2d at 466; *see also Mid-American Waste Systems, Inc. v. City of Gary, Ind.*, 49 F.3d 286, 291 (7th Cir. 1995) ("Depositing garbage in landfills is not exactly a fundamental right, either. Disposition of waste is a highly regulated industry. A claim that the

21

Constitution protects this industry from public control—even when the landfill is public property—would bring nothing but belly laughs."). Second, the court cannot conclude that the defendants subjected Bleecker to arbitrary and unreasonable treatment bearing no substantial relationship to the public health, safety or welfare. Contrarily, as already discussed, the defendants' conduct relates to the enforcement of legitimate local ordinances and regulations that Bleecker had not complied with satisfactorily. In *Town of Cedarburg v. Shewczyk*, the Wisconsin Court of Appeals discussed the authority of local governments to govern development:

> Wis. Stat. § 62.23(7)(a) vests a municipality with the authority to enact ordinances, resolutions or regulations related to the location and use of buildings. The statute easily incorporates the granting or denial of conditional use permits. In fact, in subsec. (7)(e) of this statute, municipalities are empowered to make special exceptions to the terms of a zoning ordinance. . . . The law provides that the Town has discretion to issue such a [conditional use] permit and the right to seek enforcement of it.

2003 WI App 10, ¶¶ 16-17, 259 Wis. 2d 818, ¶¶ 16-17, 656 N.W.2d 491, ¶¶ 16-17. Hence, Bleecker's substantive due process claim falls along the same lines as those rejected repeatedly by the Seventh Circuit in similar cases. *See e.g., Estate of Himelstein,* 898 F.2d at 577 ("This court has held that government decisions motivated by local interests do not violate a plaintiff's right to substantive due process."); *Coniston Corp.,* 844 F.2d at 466-467 ("For it is tempting to view every zoning decision that is adverse to the landowner and in violation of state law as a deprivation of property. . . . No one thinks substantive due process should be interpreted so broadly as to protect landowners against erroneous zoning decisions."); *Burrell,* 815 F.2d at 1129 ("Plaintiffs' claim under Section 1983 for an alleged substantive due process violation fails because plaintiffs have not been deprived of a

22

constitutional right. . . . Moreover, a review of the evidence reveals that the decisions of the Plan Commission and the City were reasoned applications [of local ordinances]."); *Harding v. County of Door*, 870 F.2d 430, 432 (7th Cir. 1989) ("In interpreting the ordinance the Board analyzed the rationale underlying the statute and rendered a decision that it believed was consistent with the intent of the legislature that drafted it.").

### III. Conspiracy - Counts III, VI, and VII

Bleecker asserts three causes of action citing conspiracy by the defendants. Each is addressed below.

First, Bleecker asserts a federal conspiracy claim pursuant to 42 U.S.C. § 1985(3). "To establish a claim for civil conspiracy under § 1985(3), a plaintiff must demonstrate (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263 (7th Cir.1999). "In order to establish the existence of a conspiracy, the first element required in a § 1985(3) claim, a plaintiff must demonstrate that the conspirators have an agreement to inflict injury or harm upon him." *Id.* "The plaintiff also must show some racial, or otherwise class-based, invidiously discriminatory animus behind the conspirators' actions, and that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment." *Green v. Benden*, 281 F.3d 661, 665-66 (7th Cir. 2002); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-268 (1993) (noting that in a § 1985(3) claim, "a plaintiff must show, inter alia, that some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' action"); *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94

F.3d 307, 311 (7th Cir. 1996). "This requirement of class-based invidiously discriminatory animus has been narrowly construed, to prevent Section 1985 from being converted into a general federal tort law." *Rodgers v. Lincoln Towing Serv., Inc.*, 771 F.2d 194, 203 (7th Cir. 1985).

In this case, Bleecker's claim fails because he cannot demonstrate, among other things, that he qualifies as a class subject to "some racial, or otherwise class-based, invidiously discriminatory animus" by the defendants. Bleecker argues that this provision is satisfied if the court finds that he qualifies as a "class of one" under *Olech*. However, as discussed earlier, Bleecker does not satisfy this standard nor does he point to any factors that make § 1985(3) applicable to his circumstances.[7] Further, Bleecker's claim is based in part on his allegation that the defendants' conspired against him due to his controversial development plans and the conspiracy was intended to interfere with or otherwise frustrate his development activities. Such allegations are not necessarily covered by § 1985. *See generally United Broth. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott,* 463 U.S. 825, 838 (1983) ("We thus cannot construe § 1985(3) to reach conspiracies motivated by economic or commercial animus."). Finally, as discussed below, the evidence pointed to by Bleecker is insufficient to create a reasonable inference that the defendants had any agreement constituting a conspiracy for the purpose of injuring Bleecker.

Moving on, Court VI of Bleecker's Complaint charges a conspiracy claim under Wisconsin common law. Specifically, he asserts that the defendants "conspired to violate, inter alia, Wisconsin Stats. § 134.01, and the Plaintiff's right to equal protection and due

---

[7] Further, it is not clear that the a § 1985 conspiracy claim even recognizes the *Olech* "class of one" concept. *Cf. Burns v. State Police Ass'n of Mass.*, 230 F.3d 8 (1st Cir. 2000).

process of the law, under the Constitution of the State of Wisconsin." (Compl. ¶ 142.) In Wisconsin, the elements of a common law conspiracy claim are (1) formation and operation of a conspiracy; (2) wrongful act or actions done pursuant thereto and (3) damage resulting from such act or acts." *Onderdonk v. Lamb,* 79 Wis. 2d 241, 255 N.W.2d 507 (1977).

Relatedly, Count VII of the Complaint alleges violation of Wisconsin Statute § 134.01. Wisconsin Statutes § 134.01 is a trade regulation inviting a penalty of "imprisonment in the county jail not more than one year or by fine not exceeding $500" should "[a]ny 2 or more persons . . . combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another . . . ." *See Brew City Redevelopment Group, LLC v. The Ferchill Group*, 2006 WI App 89, 289 Wis. 2d 795, 714 N.W.2d 582 ("Although phrased as a criminal statute, a party may bring a civil action under the section to recover damages caused by its violation.").[8]

The nature of both state law claims, Counts VI and VII, assert a conspiracy by the defendants to damage Bleecker's business. Thus, the claims are related and can be discussed together.

"[T]o form a conspiracy there must be an 'agreement to violate or disregard the law,' and the persons involved must 'knowingly [be] members of the conspiracy.'" *Bruner v. Heritage Cos.*, 225 Wis. 2d 728, 736, 593 N.W.2d 814, 818 (Ct. App. 1999) (citing Wisconsin Civil Jury Instruction 2800). "At a minimum, to show a conspiracy there must be facts that show some agreement, explicit or otherwise, between the alleged conspirators on the common

---

[8] Wisconsin recognizes both a common law conspiracy claim and a conspiracy claim under Wis. Stat. § 134.01. *See Fabert v. Hot Spur Partners, LLC*, 287 Wis. 2d 827, 705 N.W.2d 905, 2005 WL 2218418, 5 (Ct. App. 2005) (unpublished) ("Under the common law, a civil conspiracy is a combination of two or more persons acting together to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means. . . .[Unlike a claim under § 134.01] a common law conspiracy claim does not require malice.").

25

end sought and some cooperation toward the attainment of that end." *Augustine v. Anti-Defamation League of B'Nai B'Rith*, 75 Wis. 2d 207, 216, 249 N.W.2d 547, 552 (1977). The "[m]ere similarity of conduct among various persons and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish the existence of a conspiracy." *Bartley v. Thompson*, 198 Wis. 2d 323, 345, 542 N.W.2d 227, 236 (Ct. App. 1995) (quoting Wisconsin Civil Jury Instruction 2800).

Here, Bleecker maintains that "Mr. Zilk ordered Independent Inspectors, Ltd., to draft the 'Bleecker policy'" and that "Mr. Zilk and Mr. Schroeder stated that they wanted something other than a car wash/oil change facility on Mr. Bleecker's Highway 67 property." (Pls.' Br. in Opp. 21.) He then concludes that "[t]ogether with the other members of the Board and Plan Commission, they conspired to frustrate Mr. Bleecker into either changing his plans or selling his property." (*Id.*) However, similar to the Court of Appeals in *Bartley*, this court finds that Bleecker "does not ask us to draw a reasonable inference in this respect; he asks us to speculate." *Bartley,* 198 Wis. 2d at 345, 542 N.W.2d at 236. As noted earlier, the record only indicates that the letter drafted by IIL's Robert Blankenheim was to be sent to Zilk and others; it does not show that such a so called Bleecker policy was ever adopted, pursued, or enforced by the defendants. (*See* Delacy Dep. 66-67.) Further, while Bleecker does not cite statements of Zilk and Schroeder, even if such statements were made, they are not evidence sufficient to infer that there was agreement among the defendants to injure Bleecker. In all, there is no evidence that any of the defendants came to a "meeting of the minds" regarding Bleecker's development proposals. Further, there is no evidence that the defendants conspired to disregard or violate the law, *see Bruner*, 225 Wis. 2d at 736, 593 N.W.2d at 818,

26

or that they conspired for the purpose of "inflicting a harm [on Bleecker] for the sake of harm as an end in itself," *Maleki v. Fine-Lando Clinic Chartered, S.C.,* 162 Wis. 2d 73, 469 N.W.2d 629 (1991) (discussing the required element of "malice" in a § 134.01 claim).[9]

In sum, the court concludes that Bleecker's claims under 42 U.S.C. § 1983 and 42 U.S.C. § 1985, as well as his state law claims, cannot survive summary judgment. Therefore,

IT IS ORDERED that the defendants' motion for summary judgment is granted and this case is dismissed.

Dated at Milwaukee, Wisconsin, this 8th day of July, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE

---

[9] In addition, in interpreting case law on conspiracy and § 134.01, the Wisconsin Court of Appeals indicated that it may indeed not be possible for members of a governing unit who have a unity of interest to be guilty of a conspiracy. In *Bartley v. Thompson*, 198 Wis. 2d 323, 542 N.W.2d 227, the court noted the rule "that parties, such as a parent corporation and its subsidiaries, who have a unity of interest and common objectives, cannot be guilty of a conspiracy as a matter of law." It concluded that "We see no reason why the rule would not be equally applicable to defendants within a single governmental unit such as the executive office."

27